Good afternoon, everyone. The submission before the prior panel is vacated, and the panel, as currently constituted, will decide this case. This is the time and place set for argument in the case of Federal Trade Commission v. QYK Brands LLC. Council, for appellant, please approach. Scott Wellman Good afternoon. May it please the Court, my name is Scott Wellman. I'm the counsel for the appellant. I would like to reserve five minutes for a rebuttal. Counsel, please be reminded that the time shown is your total time remaining. Yes, Your Honor. Thank you. Since this is somewhat of a unique situation, may I inquire whether the judges, other than Judge Collins, have reviewed the video of the prior argument on March 6? I have not. I've read all of the papers, but I have not reviewed the prior argument. So you're starting from ground zero. Okay. Thank you, Your Honor. I may refer to some comments that occurred on March 6. As I do now, I want to start out with what I think is the most important part of this appeal, which is the scope of the injunction that imposes a lifetime permanent ban on all six of the defendants from ever engaging in the PPP industry. How broadly is PPE? I'm sorry, Your Honor. How broadly is that industry defined? It is defined in the injunction as including anything, not just limited to COVID, but anything that may treat any infection or any disease. As it is defined in the injunction, my clients are not permitted to manufacture or sell ointment to treat foot fungus for the VA that they had contracts with. They're not permitted to manufacture or sell anything to treat cuts or abrasions. They are not permitted to manufacture or sell surgical scrubs or masks or gloves. They are not even permitted to manufacture a Band-Aid or an aspirin. Counsel, how would you suggest that we narrow the injunction? What language would you suggest to us that would satisfy your concerns? Your Honor, it was suggested actually by Judge Kleinfeld at the prior hearing that since we are dealing with delays in shipment, that limiting the injunction to prohibiting shipping time advertisements that cannot be fulfilled would be sufficient. Now, we had stipulated to that very injunction. That was what was asked for in the complaint, in the amended complaint, and what we stipulated to. It wasn't until the final summary judgment came out that this extra language was slipped in. Now, I understand that... When you say slipped in, that suggests something nefarious. Who, quote, slipped it in? Well, it wasn't Judge Gutierrez, Your Honor. I believe it was slipped in by my colleague here or by the FTC at the last minute, and it just slipped through, and that happened. It was those words that I just mentioned. Any disease or infection that makes it so broad. Is the late shipment the only wrongdoing alleged against your client? There is also the representation made by one of the defendants, Ms. Nguyen, in that one Vietnamese TV interview regarding a supplement called Basic IAGG. Now, what's so ironic is that supplement is not enjoined by this injunction. A supplement is not considered a PPE, and the FTC admits that. So we're apparently here because of the delayed shipments and what Ms. Nguyen said in that one TV interview in Vietnamese. It's her language. Only $14,000 of that was ever sold, by the way, and yet the injunction doesn't even apply to that, but applies to this case. Do you want us to rewrite the injunction, or would you send it back and say it should be narrower? I would like this court to give what is a fair and equitable injunction. And you want us to write the injunction? Well, either way. I know this injunction is too broad. If the judge, if this court is inclined to overrule or say it was too broad and send it back with That's fine with me. That's what the law requires. Well, you intimated that the judge, this was not the wording of the judge, so why wouldn't it be prudent to send it back to the judge to confirm whether or not this was the judge's intent for this language to be in there? Very well. If the judge wants to hold a hearing on that, then that is fine. I would like to... Well, not hold a hearing. The judge doesn't have to have a hearing on it. The judge can, if we remanded, the judge can confirm whether or not this was the judge's, because your implication was it was not the judge's intent for this language to be in there. So if we send it back, the judge can confirm or deny whether or not this was the court's intention. If I misspoke, if it was the judge's intent, then it was an overbroad injunction, which violates both Lamb, Weston, and the most of Galvez v. Jadot. Injunctions must be specifically tailored to address the remedy, only the harm. And in the Galvez cases, specific tailoring is particularly important where relief can be structured on an individual basis, like we have here. Counsel, is it fair to say that you are not so much challenging the entry of the injunction, but the scope of it? I am not challenging the injunction itself. I'm challenging the scope of the injunction. And I think, I'm not sure if it was Judge Collins, but he asked me would I be okay with this injunction, or the ban was only applied to Ms. Nguyen at the last hearing. And I think I agree. If the judge, if the court thinks that Ms. Nguyen should be permanently banned, and that's a fencing-in rule that has, can hold some water. But on that issue of the scope of who should be properly considered, you know, everyone's in agreement that Ms. Nguyen would be included. And she acted through one of her corporations, so that would be included. And then you stipulated that all the corporations had joint and several liability, so all of them are included. So it sounds like the only argument on that issue is just that the husband gets taken out. For sure, the husband should be taken out. But not any of the other, I don't see how you say that any of the other corporations get out. If you concede that she was in, she acted through a corporation, and you conceded all the corporations are on the same footing. Your Honor, with your logic, you're 100% right. I would argue, though, that in something like this, when Ms. Nguyen is being permanently banned from an industry, then we should specifically look at which corporations knew about what happened 10 years ago, and whether or not that should be applied now. Having said that, if this court believes that it should only exclude Mr. Thauma Tula, then so be it. But I do believe the injunction is overbroad as to all six defendants. Now, is it overbroad as to the husband with respect to the late shipments? It is not overbroad with respect to the husband as to the late shipments. And an injunction as to those to him, I think, is something that is correct. But as to Ms. Nguyen, if I can just talk about her for one second, or one minute. Before we leave that point, you're saying it's not overbroad as to the shipments, just as to the claims based on the representations that were made regarding this product? I'm sorry, I didn't get that. Are you saying that for the husband, it's not overbroad on the late shipment claims, but it is overbroad on the claims regarding the misrepresentation of the product that could cure COVID? Is that what you're saying? Absolutely. I think that tail language that applies to any product that either treats an infection or disease, it makes it so broad, should not in any case ever be applied to the husband. He had nothing to do with the basic IgG supplement. Just because we're touching on that, I'd like to talk a little bit about that. This is a summary judgment. Ms. Nguyen had a problem in 2014 when she was a pharmacist, one time. And then we bring it forward and we're talking about one, apparently a couple sentences made on a Vietnamese TV broadcast. And the court below used what happened almost 10 years ago on that one broadcast to say she should be banned from the whole industry. Ms. Nguyen disputes, and she did in her declaration, that what she said on that broadcast is completely different than what the... I would be willing, or at least I think the district court would have been willing, to accept as contrary evidence the translation of an authorized translator. But she's so interested herself in it, I don't blame the district judge for disregarding her translation of what she said. He did that, Your Honor. However, this is a summary judgment. And all inferences... But I have trouble, even in summary judgment, accepting her self-interest and say, but this is what I said in Vietnamese when we have a translation from the other side. It would have been very easy for you to bring in an independent translator, which you did not do. Yeah, correct. But we were talking about a product that's not part of this injunction that sold only $14,000 worth. Clearly, if she had said that, that it could cure COVID, it would have sold much more than $14,000. Well, we don't know. I mean, that's speculation. But the fact of the matter is that some people bought it, and so there's harm there. But I wanted to ask you, are you challenging at this juncture the district court's order of a full refund? Yes, Your Honor. I am not challenging an order of a full refund. But if a refund is to be given, then the product needs to be returned. Otherwise, it goes beyond consumer redress. Returned at whose expense? If there's a shipping cost, we will pay for the shipping of it. So what case are you relying upon to support the argument that in order for the district court to order a refund, that the product must be returned? What case says that? Your Honor, it's the Figge case. Which case? The Figge case. The Figge case? In Figge, Your Honor, there was heaters that represented these heaters. Excuse me, they were smoke detectors. And what was represented was found not to be true. The court said they get a refund, they set up a redress fund, they get a refund, but they must return the product. That's a little different than a consumable product, something that you use and you use up. So I think there's a distinction to be made there. Why should they have to return a product if they used it? There was nothing prohibiting them from using it. The delay was the harm. If they used it and they got the benefit of it, then it has inherent value. But there still was the delay, which is still the genesis of the claim. So they got it, but they got it later than it was represented that they got it. So I'm not sure under that circumstance that they would have to return it to get a refund. Let me pose this. Is there a difference between it being one day late, one week late, several weeks late? Well, that's an issue for the district. Once the district court decided that there had been harm, that's a finding that's made for the record. So we don't have to draw those lines. I'm just trying to flesh out under what authority we would say that the district court erred in saying there didn't have to be a return. Exactly. But this is a summary judgment. There was no hearing. There was no analysis done on the harm to somebody one day versus somebody one week. Is there evidence in the record that the delay was as little as one day in any instances? Yes. It was in the declarations of the parties. Yes. In fact, after April, starting in May, all the products got there on time. There were no delays, and yet he's ordered a refund to every one of those products. We're talking about thousands of dollars. There's no analysis whatsoever. Let's say the judge enters the order that you want, that is to say no refund unless the product is returned. What happens if the product comes back half-used? Do you get half a refund? What are we talking about in practical terms? Well, we would stipulate if they used half of it, we would go ahead and refund it, the full amount. I would also stipulate... And what would your client do with it once it comes back? I assume they're just going to throw it away. I am not sure, Your Honor. Well, you better be sure because there's an expiration date on it. Yes. You look at Perel, it's five years. You look at our products, we're between two and three years. But you're right. They'd probably just throw it away. Well, and they might not even know is it clean, is it pure. I mean, if you got it back on a refund, if they're going to reuse that, that's all the more reason not to do business with your client. What about in the redress application that they checked? They checked that did not use it. They checked that. We would accept that. Maybe they threw it away themselves. They didn't use it. That's the problem with having a consumer good being returned. There are just too many computations of fact that might make it not prudent to have that requirement. It seems to me that the primary thing you would accomplish by requiring the return is to greatly reduce the number of claims just because of the nuisance of returning it. Well, that happens. But Section 19 prohibits... Do you agree that that's actually the likely consequence that you'll get far fewer claims if a return is required? Your Honor, we would accept what I said. A check on a paper without returning anything saying we did not use it. If they will certify that, that they have to submit a claim to the FTC, just certify on it that they didn't use it. But the damages are not contingent upon never having used it. But it's exactly why... Let me ask you again. Do you anticipate... Let's compare. You say just I purchased it, I'd like the refund compared to I purchased it, I'd like the refund and I need to return it. Is the rate of successful claims going to be lower if the return is required? Yes. Without a doubt. The consequence of what you're asking for is going to be a substantially reduced liability on the part of your client. That's what Section 19 of the FTC Act requires. It cannot go beyond... But it's what? Section 19 does not allow for damages. It says it cannot go beyond any consumer redress. That's why in the Nolan case, they had to return it. That's why in the Nolan case, it required a district court to do an analysis on what damages. People got it after May. They had no damages. Actually, after about April 15th, we were pretty much 80% on time. It's just those few weeks when the whole world was turned on its head and no one knew. I mean, even our own government didn't know. And FedEx wouldn't deliver. In our U.S. Post Office, we had boxes lined up in bins. They wouldn't even collect them. That's the problem. And yet we're being punished from the entire industry because of that. I say I only got two more minutes. Maybe I should... Thank you, Counselor. It went fast. We'll hear from the government. Good afternoon, Your Honors. May it please the Court. Mariel Goetz for the Federal Trade Commission. I want to start off with the injunction issues first by correcting a gross misstatement of the actual facts in this case. Defendants were fully on notice of the precise terms of this injunction at the summary judgment briefing phase. We attached the proposed order. The exact same definition of protective goods and services was in that order several months before the Court entered its judgment. And beyond that, and this is discussed at page 46 of our brief, beyond that, a full year ahead of that, in May 2021, counsel advised opposing counsel that a permanent industry ban was what we were seeking. So there's absolutely no merit to the contention that they were not on notice of these terms. And did they object at the trial court to the scope of the requested injunction? All they objected to at summary judgment was the industry ban nature. They did not propose alternative language for the protective goods definition. And importantly, they made no argument that any defendant, any individual defendant or corporate defendant, should be carved out of that permanent ban. Now, these are sophisticated business people represented by experienced counsel. There's no reason to go back on what the district court concluded after very careful analysis as far as what sort of injunction was needed. And I also want to clarify the standard of the scope of the injunction in an FTC case is, is it reasonably related to the misconduct at issue, to the violations at issue? Here, the violations span two products. It wasn't just the protein powder that drove this injunction. It was the protein powder and the hand sanitizer sales. Both of those products are clearly within this broader category of protective goods and services. I think that's undisputed. And in FTC cases, there are plenty of cases affirming injunctions and FTC cease and desist orders that expand the injunction beyond the specific product at issue. So it's well established. That's the Litton Industries case, the Sears case from this court, Colgate-Palmolive from the Supreme Court. It's pretty standard to enjoin defendants. I mean, there does seem to be something of a mismatch between, you know, the fraud, which was really with respect to the delivery time on the one product, and then with respect to the, you know, the elements of the capacity of the protein powder. And yet the injunction that's entered doesn't cover the thing as to which there was fraud as to its capability. It does, though, Your Honor, and that's another thing I wanted to correct. So the definition is tied to products that are represented to treat design, treat or prevent any sort of infection or disease, including COVID. So it does apply to dietary supplements. If they're marketed in a way as the appellants marketed the protein product here, which was to protect people from COVID-19. So you're saying that the language that says that protected goods and services means any good or service design intended or represented to actually cover the conduct with respect to the hand sanitizer. I mean, the protein powder. Exactly, Your Honor. So it depends on how it's marketed. And so it is actually logical to prohibit that. What the two sets of violations have in common is that appellants show themselves to be untrustworthy in marketing products that touch on human health and safety at a time when consumers are especially vulnerable. We don't know when the next pandemic is going to be or the next natural disaster where these sorts of goods are in high demand. And what both sets of wrongdoing have in common is that defendants show that they are perfectly willing to prioritize their profits and their revenues over protecting the public and delivering on what they're telling consumers. But what's your response to opposing counsel's position that this was all in a time of turmoil when there were no deliveries possible? And so, in essence, the delays were outside the control of his clients. What's your response to that? Yes, that's not at all what happened in this case. So appellants knew as early as the time they started the big Google ad that made the most egregious misrepresentation about the hand sanitizer that it was going to be difficult to get hand sanitizer, that borders were being shut down, shipments were being canceled. They then continued to make those same claims, not only in March but throughout April. They circumvented the Google ad. Now, they didn't make quite the same claim. They didn't say ship today. They just said versions of ships promptly or whatever. Is that right? They did, Your Honor, in a second Google campaign in April and May. But outside of the Google, what did they say? All over their website, they said ships in one to two days, three to five days, five to seven. That's undisputed. No, no, I understand that. I'm just saying I don't think all of the shipping promises were shipped today. That's true, Your Honor. That's true. Fair enough. What about opposing counsel's representation that the latter dates the shipments were prompt? Do you agree with that? I don't agree with that, Your Honor. But also importantly, the vast majority of sales happened in March and April. By May, sales were trickling in, I think only a few thousand from May through August. So the vast majority of sales were in March and April when the most egregious misrepresentation. What was the undisputed number of sales that were delivered late? I read the number's 300,000 somewhere. So we made an estimate based on the best available records we were able to piece together. Now, importantly, appellants didn't maintain adequate records documenting either the claims that they were making as far as shipping time or when they placed the shipments in the mail carrier's possession. That's what Mitor requires. And Mitor actually says when defendants don't maintain adequate records, you can presume a violation. And so that's sort of a separate basis on which to affirm. But what we did was we estimated based on the best evidence we had, making some assumptions or simplifications about what the claims were at which time. And what that showed is that over 30,000 of the 40-some-thousand sales were more than 10 days late. And more than 10,000 were more than 30 days late. Appellants admitted that they never claimed shipping times of more than 10 days. And the district court found that they lacked a reasonable basis to make any of those claims from 1 days to 10 days. And so it's fair to presume on this record that essentially all their sales stemmed from violations of Mitor. Let me ask you this. The district judge in justifying the injunction or in the scope of the injunction refers to the disciplinary proceeding against Ms. Wynn. We were just told that that's a long time ago and irrelevant. Do you have a response to that? I do. It's not at all irrelevant, Your Honor. And I also wanted to respond to my friend on the other side's contention that it was a one-time incident. It was not. It was a series of misconduct, pretty egregious misconduct, that took place over the course of a year. It's not at all irrelevant. I think it's highly probative of what sort of injunction might be necessary going forward to protect the public. And so what was the conduct? The conduct involved filling prescriptions for opioids that had been flagged as very likely overprescribed, adulterating drugs from one pharmacy, storing them in her garage, and then not sending them back to the manufacturer like the law requires, and misrepresenting, basically stealing products from her former pharmacy and misrepresenting who she was on the phone to reorder replacements at the former pharmacy's expense. And how long prior did this take place? I believe this took place in the 2010s, maybe 2014, something like that. And this is all in the excerpts of record, and you can look up the details. They're cited in our brief. But I also want to point out that when the district court – I think there's no dispute that the district court articulated the correct legal standard for determining whether an injunction should issue and what the scope should be. And the court considered all of the wrongdoing, not just the protein powder. That was important, but also the hand sanitizer violations, and in particular the fact that they were knowing violations and repeated violations and that they could be transferred to other product lines. And that was all part of the court's thoughtful analysis in what kind of injunction should issue. What's your understanding of the scope of review of an injunction that's entered in connection with a summary judgment motion as opposed to after a contested hearing? I don't think it matters on review, and this court has upheld injunctions. I think the Gill case, the FTC v. Gill, was a summary judgment case. That involved a permanent ban injunction. I mean, the only relevance of summary judgment is was there a dispute of material facts that should have been tried below. But Figge was actually a summary judgment case. I know that wasn't so much an injunction case, but there's plenty of cases that impose permanent injunctions that are decided at summary judgment. And I don't think it affects the court's appellate review except insofar as you're asking. Do we still review the scope for abuse of discretion in your review? Absolutely, based on the undisputed facts. In the normal way, we have to take the facts on their way for the permanent injunction. That's also true. But I do want to emphasize that it's not enough to simply make arguments or conclusory statements suggesting some sort of factual dispute. Litigants have to come forward with actual facts, evidence, and that's what appellants fail to do below. Let me ask you this. You may or may not be able to answer it, and I couldn't tell from the reading that I've been able to do so far, how much of the overall business of the defendants will be affected by the injunction as it now stands? So I can't speak to that as of, like, today, their business today, but what I can tell you, Your Honor, is that before the pandemic, appellants engaged in selling beauty products and skin care products and lines of business that would not necessarily be barred by the current injunction. So they remain free to engage in all kinds of lawful commerce that doesn't run afoul of the injunction. And the other thing I wanted to point out was that appellants made no mention in the district court before the order was entered about any sort of government contracting business that they were trying to engage in or wanted to engage in. All they said was we're shifting our business model to business-to-business sales only after the court entered the injunction. And, again, they were on full notice for months that these were the precise terms that they were looking at. Only then did they go to the court with an emergency motion to reconsider, and all of a sudden brought up we have multiple million-dollar government contract cases. So they were not up front with the court below. I don't think we can fault the court for framing the injunction as it did based on the evidence that was before it and based on the arguments that the parties made. I don't think the court was required to read their minds or anticipate arguments they didn't make, and that includes the government contracts issue. And was the court required to take into consideration the arguments later, that is to say in the motion for reconsideration? The court did consider the arguments then, and it denied the motion to reconsider. It also denied the motion to stay pending appeal. So I think, I mean, that's evidence that the court felt confident that this injunction was necessary to protect the public based on all the evidence before it that was undisputed. What does the record say about how many consumers have requested a refund on the hand sanitizing? I don't think we have a clear number of exactly how many consumers requested refunds. What we do have good evidence of is that when consumers did request refunds, they were repeatedly given the runaround by appellants. There's a script in the record that basically says tell them that, you know, it's shipping soon and tell them that we can't give any refunds until they intercept the shipment, even if it hasn't been paid. This injunction wasn't stayed, and so isn't there, is there a process going forward where people are filing for refunds? And so there must be something in the record about how many have been made. Yes, there's evidence in the record of the dollar amount that was actually refunded to consumers, and that was deducted from the $3 million redress award. Perhaps getting to Your Honor's question a little bit, something else I wanted to bring up, is a very important point about how the district court decided to implement this redress program. We did not want a claims process in this case. We wanted checks automatically sent to every consumer who purchased from appellants. The district court disagreed with us on that point and instead ordered a claims process. Now, when courts order claims process in consumer cases like this one, what that means is that instead of most consumers who bought the product actually getting a refund, it means that only 5 to 20% of purchasing consumers, and that's at docket 13 at page 6 in the district court record, only 5 to 20% of consumers typically file claims. And so as a practical matter, at the end of the day, the actual money that appellants are going to end up having to pay to consumers is going to be substantially lower, most likely, than the full $3 million. And that was how the district court decided to address any potential concern about arguments they were making. Is that claims process as against the fund held by the government, has that been begun? No, Your Honor. Typically, claims processes like this are put on hold pending an appeal. And my guess is the longer we wait, the lower the number of claims we're going to get. That's exactly right, and I think Your Honor also made an excellent point earlier about the true purpose of why they're arguing for a return requirement. Return requirement makes no sense at this juncture. It's now 3 1⁄2 years after these products have shipped. The undisputed evidence in the record is that the expiration was 2 years from the shipment date. There's no value to the sanitizer as far as reselling it. And so the only purpose of making consumers return the product, which, by the way, small, inexpensive product, could be in someone's garage, could be in the trash can, we don't know. But consumers shouldn't be penalized for that intervening delay. And I think, Judge Rawlinson, you raised the question of what case says returns are required. No court of appeals case that I'm aware of says returns are required in FTC cases in order to get a full refund. And I want to caution the Court to not read too much into the figgy line. But I want to ask a hypothetical that came up with the prior argument, which is you advertise that the washing machines will be delivered in five days. But you know when you're saying five days it actually takes seven to do them all. And so can you come in and say you have to give full refunds for the whole value of the washing machine and they get to keep the washing machine? I agree with Your Honor that that could raise potential windfall issues depending on the facts and circumstances. And that would include how important was the timing representation and how valuable are the products that are being shipped. So washing machines... In that hypothetical, that might be a clear abuse of discretion to award full... It could be, yes. I would agree with that. I would agree with that, Your Honor. I think this situation is very different because it's such a low-cost item and it's a consumable product with an expiration date. Where in the record is the... because you said there was a two-year... Do you know where in the record... Yes, give me one moment. I can find that for you. I think opposing counsel even agreed to that. I think that's right. I know we cited... I thought he said five years when he was at the lectern. I think he said two to three years. The record evidence is two years. I'm not seeing it on my sheet right here, but I'm happy to get that for you. It's certainly cited in our brief. I think when we talk about why the return requirement shouldn't be needed. I see I only have a couple of minutes, so I want to just address a couple of the other things that were said. Again, appellants never suggested any narrowing language for the injunction. That was something they could have done. They did not do. They did not ask to carve out, for example, all products unrelated to COVID. That was something they could have done. We don't know how the court would have responded to that. They did not do that. There also was no evidence... Let me ask you about the treatment of the husband. I understand you think that they forfeited the argument, but of course in the civil rules as in the criminal rules, there's a plain error provision. It certainly seems arguably plainly erroneous to sweep him into this when all the fraud is on her. I don't think that's true in this case. Basically, all of these entities were run by both individuals, and they stipulated... It's true that Ms. Nguyen had the prior pharmacy violation, and it's true that she was the one who made the most egregious protein powder representations on the commercial, but both individual appellants were very involved in all of the businesses, and they commingled funds, they shared offices, they stipulated as to the common enterprise and that they would be jointly... The corporate entities would be jointly liable for each other's wrongdoing. They didn't say that he would be jointly liable. They didn't in that stipulation, but then they conceded the issue by not responding, and that's what the district court found. That begs the plain error question. Yes, they didn't make the point. The question is, is it plain error to sweep him into a lifetime ban when he isn't really tagged personally with any of this kind of more serious conduct? I don't think it is because of the high degree of scienter with respect to the sanitizer violations in particular, and that was influential. Sanitizer violation on timing just by itself seems awfully disproportionate to have a lifetime ban just based on that. I think to understand why it was not disproportionate, we have to go back to March and April of 2020 and understand how critical the timing, the shipping time, and inventory representations were to consumers, and this is at... If you look at SER 243 to 47, there are some snippets from various consumer complaints and declarations emphasizing that consumers bought from appellants because of the shipping time and the inventory representations. They needed the sanitizer fast. Sanitizer in six weeks is not the same thing as sanitizer shipped today. They couldn't find the sanitizer elsewhere. That's why they bought from these companies, and QIK had never sold sanitizer before this, and so that's how they reeled consumers in with these claims, and so I understand Your Honor's perspective that, okay, shipping time delays, maybe it's not as serious as some of the protein powder claims, but I think when you look at all of the evidence as a whole and the repeated violations in both the protein powder and the sanitizer, sales, you can understand why the district court settled on the injunction that it did. You three judges, Your Honors, don't need to agree that you would have done the same thing in that situation, and courts have emphasized that the question is, was it so far out of bounds that it's completely unreasonable to make that determination, and I think on this record, especially based on the arguments that were made below and the facts that were not presented below, it's more than reasonable, and this court should affirm and certainly not revise the injunction based on belated arguments made before this court. All right. Counsel, you've exceeded your time. If there are no further questions. Thank you, Your Honors. We'll hear rebuttal. Mr. Tamla? Mr. Tamla Patula does not speak or understand Vietnamese. He had no idea about this Vietnamese TV station interview and what was said until the FTC brought their action. So to say there's scienter for him I think is improper. This is the only company, I believe, in the whole and entire United States that during March and April were 16 to 18-hour days they brought their employees in to get a product together. You've said that. I know that already. Let me ask you this. You said, I think I've got it right, that the government slipped it in and that it slipped it in at the end. That's not what the government just said. The government said whether it was slipped in or put in that you had quite a bit of notice that this was the injunction that the government was seeking. Is the government telling me the truth? Your Honor, they gave me notice back in March, but they also gave me a proposed stipulated injunction that did not have it in there. So when the summary judgment came down, it was not part of our potential deal. Well, apparently you were unwilling to stipulate whatever it was. Because they wanted a $3 million judgment. But if it's a stipulation, it sounds like it's a proposed settlement, and you just didn't agree to it. I would have agreed to that injunction. I had no problem with that injunction. What I'm after is I'm so far not convinced that a proposed stipulation was something that allowed you to disregard the requested relief that had been requested much earlier. Because that's your implication. We talked about the scope of the injunction also in the motion that we brought immediately after and in the motion to stay in front of the district court. Both times, the district court denied those. So we did bring that up. Okay, but again, that's a different question. I asked you whether the government was telling us the truth when it said that the terms of the requested injunction were before you quite a long time before the entry of judgment. And I think the answer is the government probably told the truth. Is that right? The government said yes. The government told me that back in April. But they changed their mind. And we had a different deal. And then they put it back in and slipped it in at the end. That was my problem. You didn't have a deal. Because if you had a deal, this case would be settled. We had a deal on injunction, but we did not have a deal on the refund amount. So that's why the case wasn't settled. If the refund amount had been done with a redress fund that was acceptable, the whole thing would be settled. Once you don't settle, everything is back on the table. I don't understand how you say they slipped it in when it was always their proposal. And once you didn't agree on everything, it went back to what it was in the beginning.  It wasn't in a stipulated preliminary injunction. Not stipulated. Their requested injunction. At some point, they gave you proposed language that included the language that you now say was slipped in. Never. Never. Never until the summary judgment was filed. That's when I got it. They talked about it earlier on with me. And I told them. No, in writing. Your position is the language that was in the injunction was never given to you in writing ahead of time. Is that what you're saying? No, I can't say that. Because we had e-mails going back and forth where we discussed this and we were talking about the scope of the injunction. But it was clear to me that before they filed their summary judgment, that broad language was not to be in there. And that's what blew up the whole settlement. Your opposing counsel said that the expiration date on the hand sanitizer was two years, but I thought I heard you say something differently. What is the answer and where in the record is that? I don't know where it is in the record. All I know is if you Google, it will say three to five years. Perel is five years. I believe ours is two to three years. We're not going to Google anything. We're going to go by what facts are in the record. Yeah. I don't know if it's two to three years or two years. It certainly isn't five years. But I think we can concede that as of now, if we got any of this stuff back, we would have to throw it away because it's past even the two and a half, three year. So the only function that would be served by asking the refund would be to, the only effect would be it would be thrown away and there would be fewer claims against you. No. And I'll tell you why. Because if the consumer used it, Your Honor, then they had inherent value and it would exceed their consumer redress to be able to use it. That's not what I asked, but that's all right. No, I understand what you're saying and I agreed with you. No, I asked it again, but this time you disagreed with me. But I thought in the case that you cited, they had said that it's not the value of the product, it's the delay. That's the injury. And so it doesn't matter if they use it. The delay is still there and that's an injury. The delay is there, but the amount of injury differs significantly, whether it's one day, one week, or several weeks. And there was no analysis done on that. And that's how in the Nolan court, FTC versus Nolan, the judge denied summary judgment because he said there had to be an analysis on the amount of the injury. All right. Thank you, counsel. Thank you. Thank you to both counsel for your helpful arguments. The case just argued is submitted for decision by the court and we are adjourned. All rise.
judges: FLETCHER, RAWLINSON, COLLINS